Toma *v.* Unemployment Compensation Board of Review and Mack Printing Company, Intervening Appellee.

Keiber *v.* Unemployment Compensation Board of Review and Mack Printing Company, Intervening Appellee.

Ficzko *v.* Unemployment Compensation Board of Review and Mack Printing Company, Intervening Appellee.

Chegwidden *v.* Unemployment Compensation Board of Review and Mack Printing Company, Intervening Appellee.

Argued September 8, 1971, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MANDERINO, MENCER and ROGERS.

*Joseph L. Rosenfeld,* for appellants.

*Raymond Kleiman,* Deputy Attorney General, with him *Sydney Reuben,* Assistant Attorney General, for appellee.

*George F. Coffin, Jr.,* with him *Carl F. Skinner,* for intervening appellee.

OPINION BY JUDGE CRUMLISH, JR., December 16, 1971:

Before us is an appeal from a decision and order of the Unemployment Compensation Board of Review dated August 19, 1970 affirming a Referee's denial of unemployment compensation benefits for the period during which appellants were involved in a work stoppage. The issue presented herein is whether that work stoppage was the result of a strike or of a lockout. Section 402(d) of the Act of December 5, 1936, P. L. 2897, 43 P.S. §802(d) provides that employees are eligible for unemployment compensation only during a work stoppage resulting from a labor dispute if the stoppage was caused by a lockout. We hold that appellants prevail and are entitled to payments under Section 402(d), subject to certain conditions referred to hereinafter.

Claimants are employees of the Mack Printing Company who were members of the Mack Printing Employees Association, their collective bargaining agent. The Company and the Association were parties to a collective bargaining agreement which expired on December 31, 1968.

The labor dispute which gives rise to this appeal has unique and somewhat complicated factual incidents which should be delineated in light of the bearing they have on the result we obtain today. In October of 1968, negotiations began between the Company and the Association in order to discuss the terms of a new agreement. After several meetings had been held and no terms yet agreed upon, the Company announced on December 20th that it would not be available for negotiations until January 6th.[1] The Company, on Decem-

---

[1] At this time the Chief Counsel and Negotiator for the Company announced that he would be unavailable for negotiating pur-

ber 20th, also sent to the Association a proposed agreement which provided that work should continue under the terms of the then existing agreement during the negotiations, until January 31st. Incidentally, the proposal did not provide for retroactivity to January 1, 1969. The Association did not accept this proposal.

No negotiations were conducted after December 20th but work continued as regularly scheduled up until the 31st of December. At that time the Federal Mediation and Conciliation Service suggested a ten-day cooling off period. The Association assented and so informed the Company but it failed to respond.

On January 2nd,[2] the members of the Association reported to work and completed the first shift. A request by the Association that the Company allow an employees' meeting was refused by the Company, but a meeting of the employees was nevertheless held after the completion of the first work shift. At that time a vote was taken and the Association called for a work stoppage until the Company had replied to the recommendation of the Federal Mediation and Conciliation Service. After this meeting and vote, two employees, who continued to work, were told by supervisors to leave the plant. The work stoppage began on the evening of January 2nd at which time the Association began to picket the Company.

On January 6th, the Company, by certified letter, notified the *employees* that it considered their action to be an illegal strike and that anyone who had failed to show for work lost his status as an employee of Mack Printing Company, and all benefits including Company sponsored insurance would be cancelled. Thereafter, two employees were told by the Company's supervisory

poses until after the expiration of the agreement, to wit, until January 6. See Notes of Testimony, pages 217a, 89a, 129a.

[2] January 1st being a holiday, the first workday after the contract expired was January 2.

personnel that they could not report to work and that they should resolve their labor problem through their Association representatives. The work stoppage continued until March 3, 1969, at which time a new collective bargaining agreement came into being.

In determining whether the management or the union caused the work stoppage, we resort to this test. "Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations?" *Erie Forge and Steel Corp. v. Unemployment Compensation Board of Review*, 400 Pa. 440, 444, 163 A. 2d 91 (1960); *Philco Corp. v. Unemployment Compensation Board of Review*, 430 Pa. 101, 104, 242 A. 2d 454 (1968).

Applying this test to the present factual situation, we hold that the work stoppage which commenced on January 2nd unfolded into an illegal lockout on January 6th because of the conduct of the employer on that date. Accordingly, appellants are entitled to unemployment compensation benefits for the period commencing January 6th and ending when the work stoppage ceased. However, we do find and so hold that during the period January 2nd to January 6th the work stoppage was the result of a labor dispute *other than a lockout* and compensation benefits must be denied in accordance with Section 402(d) of the Act.

It cannot be disputed that the employer, by its proposal of December 20, 1968, offered to keep the company open and have work available under the terms of the then existing contract. But it is equally undeniable that the Association agreed to the suggestion of the Federal Mediation and Conciliation Service for a ten-

day cooling off period. This acceptance of a cooling off period was a clear manifestation by the Association of its willingness to continue the status quo. The Company refused, without explanation, to consider the proposal, and although it did operate the plant the first shift on January 2nd, it sent home employees still working the second shift. In the meantime, the employees at a meeting on January 2nd voted to stop work *until the Company responded to the request for the cooling off period.* Finally, on January 6th, and by extraordinary coincidence, the return date of its Chief Negotiator, the Company announced that those employees involved in the dispute would not be permitted to return to work *absent a union-employer contract.*

Under these circumstances, responsibility for the work stoppage cannot be indisputably attributed to either the Company or the Association for the period January 2nd until January 6th. This being so, compensation cannot be awarded during that period. During the preliminary stages of this work stoppage, as is indicated by the factual footwork referred to above, each side was looking for a clear assertion by the other that it would not continue to provide employment or labor under the status quo. If fault of a work stoppage is attributable to both employer and employees, compensation must be denied. The purpose of the Compensation law was to benefit faultless employees. *Punxsutawney Co. v. Unemployment Compensation Board of Review,* 188 Pa. Superior Ct. 569, 149 A. 2d 683 (1959). Because of the actions of the Company on January 6th, it was reasonable for the employees to conclude that they had been effectively discharged from the employ of the Company and that, since they had been discharged, work was unavailable to them until an agreement had been reached between the Company and the Association. It is at this point that the resolution of the dispute ceased to revolve around the acceptance of status

quo. It moved into the danger zone of labor dispute when the Company manifested its intention to make work unavailable until the contract dispute was consummated by a new agreement. The Company irrevocably and unequivocally refused "to permit work to continue for a reasonable time under pre-existing terms and conditions of employment pending further negotiations." *Erie Forge, supra.* No such adamant position can be attributed to the Association.

That the Company did not physically close the plant is not determinative of the issue. *Hogan Unemployment Compensation Case,* 169 Pa. Superior Ct. 554, 83 A. 2d 386 (1951). Nor does the fact that the Company may have intended that work be available resolve the issue since the intention, if indeed there was any, was not made known to the employees. By its conduct as manifested in the January 6th letter, the Company indicated its intention to foreclose work. The all important question is whether work was available to the employees under the then existing terms and conditions. *Philco Corp. v. Unemployment Compensation Board; Hogan Unemployment Compensation Case, supra.* In *Westinghouse Electric Corp. v. Unemployment Compensation Board of Review,* 187 Pa. Superior Ct. 425, 144 A. 2d 856 (1958), compensation benefits were denied because there was no basis for the employees to believe that work was not available to them under the pre-existing terms and conditions of their employment. That is not the case here. On January 6th, the Company went too far and by its actions conclusively assumed responsibility for the continued work stoppage.

We agree that the findings of the Unemployment Compensation Board of Review are binding on appeal where there is evidence to support its conclusion. *Raiskin v. Unemployment Compensation Board of Review,* 202 Pa. Superior Ct. 60, 195 A. 2d 147 (1963). However, as Mr. Justice ROBERTS said in *Philco Corp.*

*v. Unemployment Compensation Board of Review,* 430 Pa. 101, 105, 242 A. 2d 454 (1968), a determination by the Board that work was available upon pre-existing terms and conditions, thus eliminating the lockout concept, is "more than a simple finding of fact". This is what the Court must resolve by a review of the Board's decision.

While we agree that taken in the total context of the script as it appears to bear on the ultimate decision of January 6th, the Company's refusal to negotiate from December 20th to January 6th merely relates to the issue of whether the Company was bargining in good faith, which is not in issue before us. We are concerned solely with the responsibility for the work stoppage. *See Morris Unemployment Case,* 169 Pa. Superior Ct. 564, 83 A. 2d 394 (1951).

## ORDER

AND NOW, this 16th day of December, 1971, the Order of the Unemployment Compensation Board of Review is reversed and the case is remanded to the Board for disposition consistent with this opinion.

---

CONCURRING OPINION BY JUDGE MANDERINO:

I concur with the majority that the work stoppage in this case was caused by the Company and that the case should be remanded to the Board for disposition which grants unemployment compensation benefits to the employees beginning with the January 6 date referred to in the majority opinion. I would go further, however, and also grant the benefits for the period prior to January 6. The employees were not responsible for the work stoppage which occurred during the four (4) days prior to January 6. The existing contract in this case expired on December 31, 1968. Prior to the next work day, which was January 2, 1969, the Association

clearly agreed to a ten-day cooling off period at the suggestion of the Federal Mediation Service. The Company did not respond. This, according to the record, was the reason the employees refused to continue work. Under such circumstances the Company was solely responsible for the work stoppage which began on January 2. It cannot be said that the employees, who continued to work and agreed to a ten-day cooling off period, caused the work stoppage when the Company refused to agree to any such cooling off period.