Unemployment Compensation Board of Review, Appellee, and Local (8)-901 of the Oil Chemical & Atomic Workers International Union, on behalf of its members and all others similarly situated; George Swerdon, Jr., Robert A. Crowley, Louise E. Chasse, Willard A. Scholl, Edward J. Fadden, Neanie Willis, Robert Miller, Andrew Massorelli, Anthony G. Arcomone, Irvin M. Butler, on their own behalf and on behalf of all other claimants similarly situated, Intervening Appellees, *v.* Sun Oil Company of Pennsylvania, Appellant.

Argued December 2, 1974, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., ROGERS and BLATT. Judge MENCER did not participate.

*J. Anthony Messina,* with him *Fred Speaker, James T. Giles, Kenneth L. Oliver, Susan Katz Hoffman* and *Pepper, Hamilton & Scheetz,* for appellant.

*Sydney Reuben,* Assistant Attorney General, for appellee.

*Joseph R. McFadden, Jr.,* with him *Francis A. Ferrara, Bernard N. Katz, Louis H. Wilderman, Warren J. Borish, Meranze, Katz, Spear & Wilderman,* and *Kassab, Cherry and Archbold,* for intervening appellees.

OPINION BY JUDGE BLATT, June 4, 1975:

This is an action to determine the eligibility of approximately 1700 applicants for unemployment compensation benefits covering a period in which they were out

of work during a labor dispute between their union and the Sun Oil Company of Pennsylvania (Sun Oil).[1]

Section 402(d) of the Unemployment Compensation Law, 43 P.S. §802(d)[2] provides that:

> "An employee shall be ineligible for compensation for any week—
>
> . . . .
>
> "(d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lockout) at the factory, establishment or other premises at which he is or was last employed. . . ."

The referee and the Unemployment Compensation Board of Review (Board) found here that the work stoppage between March 19, 1973 and July 19, 1973 at the Marcus Hook refinery of Sun Oil constituted a lockout. The claimants were, therefore, awarded benefits. Sun Oil now appeals, however, alleging that the work stoppage was a strike so that benefits would be barred under Section 402(d) and that, in any event, federal law bars the payment of benefits to these employees.

The collective bargaining agreement between Sun Oil and the Independent Refinery Workers Union (IRWU) was scheduled to expire on January 6, 1973. Prior to that time the parties had been bargaining in good faith to reach a new agreement, but, by the contract expiration date, a new agreement had not been reached and the parties instead agreed to continue working on a day-to-day basis under the terms and conditions of the contract which had expired. Negotiations continued for an addi-

---

1. Under agreement with Sun Oil, the employees' bargaining representative, the Independent Refinery Workers Union of Marcus Hook (IRWU), selected ten claimants to represent and bind Sun Oil and the other applicant employees in the determination of the issues raised herein.

2. Section 402(d) of The Unemployment Compensation Law, Act of December 5, 1936, Section Ex. Sess. P.L. (1937) 2897, *as amended*, 43 P.S. §802(d).

tional five weeks when on February 13, 1973 a Federal Mediator, which had been assigned to the case, certified that the parties had reached an impasse. On the same date, February 13, Sun Oil sent a letter to the IRWU expressing concern over "unreasonable delay in many matters of vital importance to Management and the employees. . . ." The letter continued, "Consequently, unless a Contract settlement is reached by 12:01 A.M. Saturday, February 17, 1973, the Company gives notice that it is hereby terminating the day-to-day Contract extension. . . . If the Contract so expires on February 17, 1973, we intend to begin implementation of some of our proposals. We will appropriately advise the Union from time to time as we begin these implementations." On February 16, 1973, Sun Oil notified the IRWU that effective February 18, 1973 the company would be implementing provisions of "our Contract proposals" on the topics of bidding for job vacancies, vacation pay, and training for temporary assignments. On February 23 Sun Oil again notified the IRWU of the "further implementation of our latest Contract proposal." This time, effective, March 4, the company indicated that it would implement provisions concerning adjustment pay, service, seniority, employee status, and job progression procedures. Still another notice, on March 14, announced implementation, effective March 25, of the new proposal as to the distribution of overtime assignments among employees.

On the following day, March 15, the IRWU circulated a news bulletin among its membership informing them of a strike vote taken by employees of the Sun Oil Refinery at Toledo, Ohio. This bulletin indicated that the Toledo workers rejected "an offer that was far better than what was offered to the IRWU of Marcus Hook." That evening the IRWU president, Anthony Arcomone, recorded a message announcing to the employees that the union executive board had authorized a strike referendum "on

Management's final Contract offer." He stated, "If we reject, we will strike at 12:01 A.M., Monday, March 19, and join our Brothers in Toledo." A vote of the membership was then taken, and, by a nine to five ratio, the IRWU rejected the proposal and work was stopped.

## I. STRIKE vs. LOCKOUT.

Was this work stoppage a strike or a lockout?

Our Supreme Court has held:

"Since the purpose of our unemployment compensation system is to compensate an individual when work has been denied him through no fault of his own, logically the test of whether a work stoppage resulted from a strike or a lock-out requires us to determine which side, union or management, first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing. As this Court stated in Vrotney Unemployment Compensation Case, 400 Pa. 440, 444-45, 163 A.2d 91, 93-94 (1960), the question we must answer to decide on whose shoulders lay the responsibility for the work stoppage is the following: 'Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a "lockout" . . . .'" *Philco Corp. v. Unemployment Compensation Board of Review*, 430 Pa. 101, 103-104, 242 A.2d 454, 455 (1968).

Neither the company nor the union, therefore, may issue an ultimatum without bearing the responsibility for the ensuing work stoppage, if one occurs. *Gray Unemploy-*

*ment Compensation Case,* 187 Pa. Superior Ct. 425, 144 A.2d 856 (1958) ; *See Toma v. Unemployment Compensation Board of Review,* 4 Pa. Commonwealth Ct. 38, 285 A.2d 201 (1971). When the work stoppage takes the form of a strike, therefore, but it is alleged to be in fact a lockout, it must be shown either that the union made the initial "peace" move by offering to continue the status quo or that it would have been futile for it to do so. *Philco Corp. v. Unemployment Compensation Board of Review,* 430 Pa. 101, 242 A.2d 454 (1968).

Obviously the peace move here was made when the union agreed to the day-to-day extension of the contract. At the time of the strike vote, approximately ten weeks later, Sun Oil had already upset the status quo through the implementation of some of its contract proposals. At the time of the strike vote, therefore, additional peace offers by the union would appear to have become futile. Sun Oil argues, nevertheless, that responsibility for the work stoppage rests with the union here because the proposals which were implemented had apparent union approval and represented either no change from the prior contract or changes of such minor nature that employees would not reasonably object to them. This may be a credible position in the minds of Sun Oil, but it clearly was not credible in the minds of the Board, which was the lawful fact finder. The Board, in fact, probably relied upon the testimony of Anthony Arcomone, the union president, that many of the implemented changes were of substantial importance to the union membership, and that in spite of apparent union cooperation with respect to some of the implementations, others of the changes were met with dissatisfaction by the membership, and the Board found that the union objected to putting agreeable individual proposals into effect absent a complete collective bargaining agreement. The record supports this finding and, therefore, it must not be disturbed on appeal. *Chambers v. Unemployment Compensation Board of Review,* 13 Pa. Commonwealth Ct. 317, 318 A.2d 422 (1974).

Sun Oil argues, of course, that it has met the Philco test[3] of continuing operations under the terms and conditions of the expired contract and cannot be expected to have preserved the status quo for an indefinite period of time. And it is true that the status quo was preserved for a period in excess of five weeks subsequent to the expiration of the contract. It is, however, the reasonableness of continuing the status quo rather than the length of time it has been maintained that controls, and an employer altering the balance even after aiding in its maintenance for a considerable time, must still demonstrate that such action is essential to the continued operation of the company. *Cf. Lerch Unemployment Compensation Case,* 400 Pa. 446, 163 A.2d 535 (1960); *Bokoski Unemployment Compensation Case,* 206 Pa. Superior Ct. 96, 211 A.2d 124 (1965). Sun Oil does not argue here, nor does the evidence suggest, that such action was so essential.

We must conclude, therefore, as the Board concluded, that Sun Oil's "action in terminating the extension of the existing collective bargaining agreement and its actions in implementing its proposals on an item-by-item basis is inconsistent with the maintenance of the status quo." And although Sun Oil may well have believed that the implemented changes were of a minor nature and were for the employees' benefit, such determinations must be left to the collective bargaining process and are not the subject matter of unilateral action in the context of The Unemployment Compensation Law. In that context, therefore, we must conclude that the work stoppage here was a lockout.

## II. FEDERAL PREEMPTION

Does the payment of unemployment benefits to IRWU members have a sufficient impact on the respective bargaining positions of Sun Oil and the IRWU so as to be

---

3. *Philco Corp. v. Unemployment Compensation Board of Review, supra,* 430 Pa. at 103-104, 242 A.2d at 455.

invalid under the Supremacy Clause of the United States Constitution because it conflicts with the federal policy of uniform regulation of collective bargaining relationships?

The arsenal of public support now available to a work force unemployed during a labor dispute most notably includes food stamps, public assistance benefits through the program of Aid to Families with Dependent Children, and unemployment compensation. The availability of these benefits and the requirements necessary to obtain them will vary greatly, of course, among the states. It is probable, too, that unions in recent years have incorporated some or all of these programs as fundamental components of their strike support programs.[4] It is no wonder, therefore, that the use of such public support by those unemployed during labor disputes has recently become subject to federal preemption attack.

*San Diego Building 'Trades Council v. Garmon,* 359 U.S. 236 (1959), *Teamsters Local 20 v. Morton,* 377 U.S. 252 (1964), and *Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America v. Lockridge,* 403 U.S. 274 (1971) establish the general principle that the National Labor Relations Act preempts state regulation of labor conduct falling within the regulatory scheme of the federal law. As stated in *Lockridge, supra:*

"The course of events that eventuated in the enactment of a comprehensive national labor law, entrusted for its administration and development to a centralized, expert agency, as well as the very fact of that enactment itself, reveals that a primary factor in this development was the perceived incapacity of common-law courts and state legislatures, acting alone, to provide an informed and coherent basis for stabilizing labor relations conflict and for equitably and delicately

---

4. A. J. Thieblot, Jr. and R. M. Cowin, *Welfare and Strikes* (1972).

structuring the balance of power among competing forces so as to further the common good." 403 U.S. at 286.

It was, however, recognized that the court could not "declare preempted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions; obviously, much of this is left to the states." *Lockridge, supra,* at 289. The concern is that one forum might enjoin, as illegal, conduct which the other forum would find legal, or that the state courts would restrict the exercise of rights guaranteed by the Federal Act. It has been held, therefore, that to impose upon a union under state law liability for damages suffered by an employer resulting from union activities not proscribed under federal law restricts the exercise of lawful labor activity under federal law. *Teamsters Local 20 v. Morton,* 377 U.S. 252 (1964).

Obviously the Pennsylvania Unemployment Compensation Law is not designed or intended to restrict or to regulate labor activity developed under the federal law. It is instead an exercise of the police powers of the Commonwealth adopted to avoid the serious menace to the health, morals, and welfare of the public which results from indigence during periods when employees become unemployed through no fault of their own.[5]

---

5. *See* the Declaration of public policy as set forth in Section 3 of the Act, 43 P.S. §752. The Unemployment Compensation Law, therefore, does not inject the state into the collective bargaining process so as to assess the bargaining demands of the parties in dispute for the purpose of encouraging a settlement. Were we to find such a purpose or effect resulting from the unemployment compensation hearings, we would have no doubt that the state law here would be invalid under the Supremacy Clause. *Oil, Chemical, and Atomic Workers International Union v. Arkansas Louisiana Gas Company,* 332 F. 2d 64 (10th Cir. 1964); *General Electric Company v. Callahan,* 294 F.2d 60 (1st. Cir. 1961). We can find no support in the statute or the record indicative of such a purpose or effect.

Against this state interest rests the federal labor scheme which clearly permits the use of strikes and lockouts as economic tools to compel concession by either the union or employer during the negotiation of collective bargaining agreements. *American Ship Building Company v. National Labor Relations Board,* 380 U.S. 300 (1965). The employer's use of the lockout will be frustrated, argues Sun Oil, by the deterrent effect of the increased tax rate which an employer will experience where massive benefits are payable, and also by the diminished economic impact upon employees that the payment of benefits itself would have upon the effectiveness of this bargaining tool. Thus, argues Sun Oil, federal law rules out the payment of benefits to employees out of work during a lawful lockout. The IRWU, on the other hand, argues that because Congress has not proscribed unemployment compensation benefits to workers unemployed during a labor dispute it cannot be said that the payment of such benefits does not fall within the federal scheme in the collective bargaining process.

The courts have confronted the preemption issue in similar actions where public benefits were paid to employees out of work during a labor dispute. In *ITT Lamp Division of the International Telephone and Telegraph Corporation v. Minter,* 435 F.2d 989 (1st Cir. 1970), Cert. denied, 402 U.S. 933 (1971), a suit by two employers to enjoin the payment of welfare benefits under Massachusetts law asked whether or not the payment of such benefits to indigent strikers infringed upon the federal policy. Denying injunctive relief the Circuit Court there stated that the "record is almost bereft of any indication of significant impact [such payments might have] on either plaintiff." *ITT Lamp Division v. Minter, supra,* at 991 n. 3. In that case the court desired persuasive evidence to indicate the impact that welfare benefits might have upon the duration of a strike, the strikers' resolve, and other factors which would tend to disclose

whether or not the federal balance had been tipped in favor of the union. Maintaining that position, in *Grinnell Corporation v. Hackett*, 475 F.2d 449 (1st Cir. 1973), Cert. denied, 414 U.S. 858 (1973) the First Circuit again denied a similar petition by an employer, this time refusing to enjoin the payment of unemployment compensation benefits to strikers under Rhode Island law. Absent persuasive evidence as to how payment of benefits might affect the bargaining relationship, as was again the case, the court there viewed Congress as the appropriate forum to determine these issues, not the courts. Since then, however, the Supreme Court, upon review of an attack on a New Jersey statute permitting welfare payments to strikers, recognized the need to accord the federal preemption argument a judicial hearing, *Super Tire Engineering Company v. McCorkle*, 416 U.S. 115 (1974). And, relying on *Super Tire, supra,* a United States District Court preliminarily concluded that the payment of unemployment compensation benefits under Hawaiian law would probably sufficiently infringe upon the federal policy so as to justify enjoining payment pending a final determination of whether or not such payments are ruled out by the federal scheme of laws regulating labor disputes. *Hawaiian Telephone Co. v. State of Hawaii Department of Labor and Industrial Relations*, 378 F. Supp. 791 (D.Hi. 1974).

In light of *Super Tire, supra,* and of the Congressional history which reveals that the existing legislative record is not sufficiently clear to establish Congressional intent either way, *Grinnell Corporation v. Hackett*, 475 F.2d 449 (1st Cir. 1973), we cannot subscribe to the IRWU's argument that Congress has resolved to permit the payment of benefits to workers during labor disputes as consistent with federal labor policy. We must, therefore, examine Sun Oil's arguments more closely to determine if the payment of unemployment compensation is indeed ruled out by the federal labor policy.

The First Circuit Court of Appeals has held that:

"Where Congress has not clearly manifested its purpose to exclude state action which takes the form of exercise of its historic police powers, such state action will not be invalidated under the Supremacy Clause, 'in the absence of persuasive reasons,' Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S. Ct. 1210, 1217, 10 L. Ed. 2d 248 (1963), or unless the administration of the state law 'palpably infringes' upon the federal policy. Southern Pac. Co. v. Arizona ex rel. Sullivan, 325 U.S. 761, 766, 65 S.Ct. 1515, 89 L. Ed. 1915 (1945)." *ITT Lamp Division of the International Telephone and Telegraph Corporation v. Minter,* 435 F. 2d 989, 992—993 (1st Cir. 1970).

On its face, we find no persuasive reasons to invalidate Section 402(d) of the Act under the Supremacy Clause nor do we find any palpable infringement of federal policy. Situations might, of course, arise for which the application of this provision would clearly bear no relationship to the balancing of interests between employers and unions during a labor dispute. We find no infringement, for example, where payments would be made to those employees not involved in any labor dispute with their employer but who are locked out of work due to a plant shutdown resulting from a lockout of employees who are involved in a labor dispute. Nor do we think that payments to employees out of work as a result of a lockout illegal under federal law would palpably infringe upon the federal policy.

In this action, Sun Oil presents virtually no real evidence which demonstrates the impact that the payment of benefits to IRWU members might have upon the bargaining relationship of those two parties.[6] It relies

---

6. This fact is probably explained by the apparent failure of Sun Oil to raise the preemption issue before the Board below.

upon the weight of its argument that substantial governmental support to these employees and the resultant increase in the tax rate of contribution by Sun Oil to the Unemployment Compensation fund will obviously strengthen the union's bargaining position and thus infringe upon the effective utilization of legitimate employer tools in the contract negotiating process. Without failing to recognize the great caution with which other courts have approached this issue where persuasive evidence was lacking, there might be some merit to be found in Sun Oil's position. Earlier decisions might be distinguished. Welfare benefits in *Super Tire, supra,* and *ITT Lamp Division v. Minter, supra,* for example, would not reach nearly so large portion of the unemployed union membership as would the unemployment compensation benefits here because such welfare payments are based upon the *need* of the recipient, a factor not considered for Unemployment Compensation applicants. Naturally, therefore, a court would desire persuasive evidence to substantiate any interference with the collective bargaining process. The unemployment compensation benefits, in *Grinnell v. Hackett, supra,* although payable to the entire membership of the striking union became available only after a seven-week waiting period. The likelihood that payments might affect the bargaining relationships was diminished, therefore, by the lengthy delay in receiving them. Understandably in that case, too, the court desired persuasive evidence to substantiate any interference with the collective bargaining process.

The payment of unemployment compensation benefits to striking employees in *Hawaiian Telephone Co., supra,* was preliminarily enjoined until hearings were conducted on the preemption issue, and it may be true that that case is not significantly distinguishable from the present one because, as in this case, there was a one-week waiting period and benefits were available to all of the union members. That case, however, remains undeter-

mined on the merits as of this writing, and, in spite of any factors which may distinguish the other cases above from the one at hand, we cannot determine that the payment of unemployment compensation benefits here palpably infringes upon federal labor policy without any evidence at all to support the argument. Palpable infringement in a case such as this must be more than a mere peripheral concern with federally regulated activity. It requires such an incompatibility between the laws that the application of the state law would frustrate the purpose of federal legislation. *Teamsters Local 20 v. Morton, supra.* Without persuasive evidence on that point, we can only speculate as to whether or not a work stoppage would be of longer duration in the presence of anticipated benefits; as to whether or not a union would stiffen bargaining demands; and as to whether or not an employer would be deterred from employing lawful economic measures to break the bargaining inpasse.

While the regulation of labor disputes clearly falls within the purpose of the federal legislation, we lack the supporting evidence here to prove that federal regulation is frustrated. As much as Sun Oil may argue that the impact upon the collective bargaining process is self-evident, we must disagree. It can be argued with equal force that the receipt of benefits, which for the most part amount to no more than fifty percent of an employee's weekly earnings, constitutes such a severe diminution of the daily income of individual employees that the effectiveness of the lockout as an economic tool in the bargaining process is not significantly impaired. At any rate, we have no evidence in the record to support a finding on this matter involved. By the same token, the anticipated increase in the rate of contribution by Sun Oil to the unemployment compensation fund, although no doubt a large sum of money standing alone, may well constitute such a small percentage of overall expenses as to have but a negligible impact upon Sun

Oil's bargaining position. Again, we have no evidence to support a finding either way. Not one word was spoken as to such effects before the Board, of course, for the issue was not raised.

In short, Sun Oil's argument sounds plausible, but it lacks evidentiary support. We must hold, therefore, that, absent more persuasive evidence than was presented here or until Congress acts in further clarification of its intent, the payment of unemployment compensation benefits under state law to employees out of work during a lockout does not per se interfere in the collective bargaining process to such an extent as to be clearly preempted by federal law.

Accordingly, we issue the following

ORDER

AND NOW, this 4th day of June, 1975, the appeal by the Sun Oil Company of Pennsylvania is hereby dismissed and the decision of the Unemployment Compensation Board of Review is hereby affirmed.

President Judge BOWMAN dissents.