**AVCO CORPORATION, Petitioner,**

v.

**UNEMPLOYMENT COMPENSATION
BOARD OF REVIEW,
Respondent.**

Commonwealth Court of Pennsylvania.

Re-Argued Sept. 15, 1999.
Decided Oct. 25, 1999.

Daniel H. Bromberg, Washington, for petitioner.

Judith M. Gilroy, Harrisburg, for respondent.

Regina Hertzig, Philadelphia, for intervenor, Robert Baker.

Before DOYLE, President Judge, and McGINLEY, J., SMITH, J., PELLEGRINI, J., FRIEDMAN, J., KELLEY, J., and FLAHERTY, J.

SMITH, Judge.

AVCO Corporation (Employer) petitions for review of an order of the Unemployment Compensation Board of Review (Board) that affirmed a referee decision awarding benefits to Robert Baker, the lead claimant in a group of 349 members of the United Automobile, Aerospace, Agricultural Implement Workers of America, Local Union 787 (Union). Employer argues that the Board misinterpreted Section 402(d) of the Unemployment Compensation Law (Law);[1] that federal law preempts the Board's application of Section 402(d); that the Board erred in failing to find that the Union instigated its members' mass refusal to work overtime and was thereby responsible under the status quo test for the subsequent work stoppage; that the referee committed an abuse of

1. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, as amended, 43 P.S. § 802(d).

discretion by failing to issue a subpoena requested by Employer; and finally that the Board erred in concluding that Employer altered the status quo.

## I.

The collective bargaining agreement (Contract) setting the terms and conditions of Claimant's employment expired on April 4, 1997 before Employer and the Union settled on a new contract. The day before expiration, Employer offered to "extend the Pre-existing terms and Conditions of Employment through May 2, 1997 or until such time prior to May 2, 1997 at which [Employer] and the Union reach settlement of a new Collective Bargaining Agreement." Employer Exhibit No. 2. The Union responded the next day with an offer to "have bargaining unit employees continue working under the pre-existing terms and conditions of employment pending further negotiations to reach a new collective bargaining agreement." Employer Exhibit No. 1. The record reflects no formal agreement documenting an extension; however, work continued until August 5 when the Union initiated a work stoppage.

When the work stoppage was imminent, Claimant filed for unemployment compensation. On September 26, 1997, the Pennsylvania Job Center determined that certain of Employer's labor practices constituted a lockout and awarded Claimant unemployment compensation benefits. On appeal, the referee affirmed the Job Center's decision. The Board affirmed the referee, and this appeal followed.[2]

The Board made the following pertinent findings of fact:

7. Article XVII, Section 6 of the contract specifies that 'foreman [sic] and supervisors shall not perform any work or operations regularly performed by employees covered by this agreement

except for the purposes of instructing employees.'

8. Article XVII, Section 6 of the contract further stipulates that 'clerical and other employees not in the bargaining unit shall not be permitted to perform any work normally performed by employees in the bargaining unit.'

9. On June 14, 1997, the employer began working supervisors and other non-bargaining unit employees on bargaining unit jobs for overtime work on most Saturdays and Sundays.

10. The union notified the employer via letter June 27, 1997, that said union objected to the employer's decision to work non-bargaining unit personnel on bargaining unit jobs and further reiterated its offer to have bargaining unit employees continue working under pre-existing terms and conditions of employment.

11. Via written correspondence on August 4, 1997, the union notified the employer of its decision to effectuate a work stoppage as of 12:01 a.m., Tuesday, August 5, 1997, to protest Textron Lycoming's labor practices wherein the union concluded that the employer disregarded the United Automobile, Aerospace, Agricultural Implement Workers of America local union 787 offer to continue working under the pre-existing terms and conditions of employment.

12. At 12:01 a.m. on August 5, 1997, the union initiated a work stoppage at the employer's premises and maintained picket lines.

13. The claimant did not report to work during the work stoppage.

14. The work stoppage has not been resolved and is continuing.

. . . .

18. Under the collective bargaining agreement, overtime is voluntary and

2. This Court's review is limited to determining whether necessary findings of fact are supported by substantial evidence, whether an error of law was committed or whether

constitutional rights were violated. *Chamoun v. Unemployment Compensation Board of Review*, 116 Pa.Cmwlth. 499, 542 A.2d 207 (1988).

neither the union nor the employer can force employees to work or not to work overtime.

19. Whenever the employer utilized supervisors and other non-bargaining unit employees on bargaining unit jobs for overtime work from April 4, 1994 to April 4, 1997, the union filed grievances to protest such action. Those grievances were not settled. The union did not pursue arbitration regarding those grievances.

20. As of January 1994, the union and company established a career resource center to provide job interviews and write resumes for displaced workers.

21. The employer made a unilateral decision to close the career center in July 1997.

. . . .

23. Approximately one week prior to the effective date of the work stoppage, the company unilaterally discontinued the crankcase department.

24. As result [sic] of the employer's action in eliminating the crankcase department, an employee was transferred to the 'mill and drill' department. The employer subsequently assigned that employee back to his old job classification for two days in July. The 'mill and drill' department is a lower grade classification. The union did not agree to that transfer.

25. The employer maintains that it used non-bargaining unit personnel to work overtime hours after April 3, 1997, because the bargaining unit personnel refused to work overtime.

Board decision, pp. 1–3. The Board concluded that Employer changed the status quo by using supervisory and non-bargaining unit employees to perform bargaining unit jobs on overtime, by transferring the aforementioned employee without union approval and by unilaterally closing the career center. Because the Employer changed the status quo, the Board determined that the work stoppage constituted a lockout and that Claimant was entitled to benefits.

## II.

Employer first contends that the Board's decision is contrary to the plain language of Section 402(d) of the Law. That section provides that an employee shall be ineligible for compensation for any week: "In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lockout) at the factory, establishment or other premises at which he is or was last employed. . . ." Employer argues that in the ordinary sense of the word a lockout occurs only where an employer withholds work and that because Employer is willing to allow work to continue there is no lockout in this case.

Pennsylvania unemployment compensation jurisprudence, however, has long recognized that a lockout may also occur when an employer allows work to continue but only under the employer's new terms. *Vrotney Unemployment Compensation Case*, 400 Pa. 440, 163 A.2d 91 (1960). In *Vrotney* the Pennsylvania Supreme Court established the following test for determining whether a work stoppage results from a lockout or a strike:

Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contact negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout' and the disqualification for unemployment compensation benefits in the case of a 'stoppage of work because of a labor dispute' does not apply.

*Vrotney,* 400 Pa. at 444–445, 163 A.2d at 93–94.

■ In *Philco Corp. v. Unemployment Compensation Board of Review,* 430 Pa. 101, 242 A.2d 454 (1968), the Supreme Court explained that the *Vrotney* test requires a determination as to which side "first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing." *Id.* at 103, 242 A.2d at 455. The status quo is defined as "the last actual, peaceable and lawful, uncontested status that preceded the controversy." *Fairview School District v. Unemployment Compensation Board of Review,* 499 Pa. 539, 544, 454 A.2d 517, 520 (1982). Accordingly, the mere fact that Employer is willing to allow work to continue under its terms does not render Claimant ineligible for compensation.

### III.

Employer next argues that the Board's application of the *Vrotney* test is pre-empted by the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151–169. Pennsylvania courts have repeatedly held that Section 402(d) of the Law is not pre-empted by the NLRA. *See, e.g., Unemployment Compensation Board of Review v. Sun Oil Company of Pennsylvania,* 476 Pa. 589, 383 A.2d 519 (1978) (*Sun Oil II*); *Keystone Coca–Cola Bottling Corporation v. Unemployment Compensation Board of Review,* 693 A.2d 637 (Pa.Cmwlth.1997), *appeal denied,* 553 Pa. 684, 717 A.2d 535, *cert. denied,* —— U.S. ——, 119 S.Ct. 177, 142 L.Ed.2d 145 (1998); *Schulmerich Carillons, Inc. v. Unemployment Compensation Board of Review,* 154 Pa.Cmwlth. 343, 623 A.2d 921 (1993). Federal courts have reached the same result. *See Duer Spring & Manufacturing Company, Inc. v. Commonwealth of Pennsylvania Department of Labor and Industry,* 906 F.2d 968 (3d Cir.1990). Each of these cases involved an application of the *Vrotney* test, and these clear precedents render Employer's preemption arguments wholly without merit.

Employer argues that none of the prior cases have fully considered the two distinct NLRA pre-emption principles articulated by the United States Supreme Court. Those principles are commonly known as the *Garmon* and *Machinists* rules. *See Metropolitan Life Insurance Company v. Massachusetts,* 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985); *Duer Spring & Manufacturing Company, Inc.* The *Garmon* rule was announced in *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), and it applies when a state purports to regulate an activity that is arguably subject to Sections 7 or 8 of the NLRA, 29 U.S.C. §§ 157, 158. The *Machinists* rule takes its name from *Lodge 76, International Ass'n of Machinists and Aerospace Workers v. Wisconsin Employment Relations Commission,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). That rule "protects against state interference with policies implicated by the structure of the Act itself, by pre-empting state law and state causes of action concerning conduct that Congress intended to be unregulated." *Metropolitan Life,* 471 U.S. at 749, 105 S.Ct. at 2394, 85 L.Ed.2d at 746.

Employer first argues that none of the Pennsylvania cases have considered the *Garmon* rule at all. This Court expressly considered the *Garmon* rule in *Unemployment Compensation Board of Review v. Sun Oil Company of Pennsylvania,* 19 Pa.Cmwlth. 447, 338 A.2d 710 (1975) (*Sun Oil I*), *aff'd,* 476 Pa. 589, 383 A.2d 519 (1978). Citing *Garmon,* among other cases, this Court explained that the Law is obviously not designed or intended to regulate labor relations, but "is instead an exercise of the police powers of the Commonwealth adopted to avoid the serious menace to the public health, morals, and welfare of the public which results from indigence during periods when employees become unemployed through no fault of their own." *Id.* at 455, 338 A.2d at 714–715. When affirming this Court, the Pennsylvania Supreme Court stated in

*Sun Oil II* that in the absence of federal congressional action, the General Assembly was empowered to allow unemployment compensation benefits to locked out employees while simultaneously denying these benefits to striking employees.[3] The *Garmon* rule is not implicated by such an exercise of police power because the NLRA is "silent as to the substantive provisions of welfare-benefit plans." *Metropolitan Life*, 471 U.S. at 749, 105 S.Ct. at 2394, 85 L.Ed.2d at 746.

With regard to the *Machinists* rule, Employer argues that Pennsylvania courts have considered NLRA pre-emption challenges to Section 402(d) of the Law based solely upon the impact of the labor dispute disqualification on the balance of the negotiating power. Employer contends that no Pennsylvania court has considered whether Section 402(d) is a direct regulation of the use of economic weapons, designed to deter the use of some weapons and to fundamentally restructure the balance of economic power in collective bargaining, and therefore is pre-empted by the NLRA. Regardless of Employer's contention, the *Vrotney* test is not a direct regulation of the use of economic weapons; it merely provides a neutral method for determining whether employees are entitled to unemployment compensation benefits during a work stoppage. It does not deter employers from using lawful economic weapons. *See generally Odgers v. Unemployment Compensation Board of Review*, 514 Pa. 378, 525 A.2d 359 (1987) (explaining that the *Vrotney* test is not designed to regulate labor disputes); *Local 730, United Ass'n of Journeymen v. Unemployment Compensation Board of Review*, 505 Pa. 480, 480 A.2d 1000 (1984) (explaining that application of the *Vrotney* test should not become entangled with the merits of the respective bargaining positions); *Sun Oil I* (explaining contrary view that the receipt of benefits constitutes such severe diminution of employee income that effect of lockout as economic tool is not significantly impaired).

### IV.

■ Employer next argues that the Board erred by not holding the Union responsible for initially violating the status quo when its members began refusing

---

**3.** After briefing in this matter and before argument, Employer called the Court's attention to *Penflex, Inc. v. Bryson*, 506 Pa. 274, 485 A.2d 359 (1984). Employer contends that this case bears directly upon applicability of the *Garmon* pre-emption rule raised and argued by Employer in this appeal. The case involved a very narrow issue and one of first impression for the Supreme Court, which was called upon to decide whether employee participation in an illegal strike under federal law constituted willful misconduct under Section 402(e) of the Law, 43 P.S. § 802(e). The Supreme Court held that where the parties' collective bargaining agreement, which did not contain a notice provision under 29 U.S.C. § 158(d), had expired prior to the employees' work stoppage, the strike was not a breach of contract and thus was not illegal.

The parties' agreement expired on June 30, 1980. The employees failed to report to work on July 1, 1980 and instead set up a picket line and were thereafter discharged by the employer. The Supreme Court held that although the union's failure to give the 30–day notice required by 29 U.S.C. § 158(d) violated federal law, the employees' participation in a

strike did not amount to willful misconduct which rendered them ineligible for benefits. The court stated that "[t]o hold that participation in a strike in contravention of federal law constitutes willful misconduct under Section 402(e) would require the courts, in every case, to determine whether an alleged infraction of federal law in fact occurred and, if so, whether the strike must be deemed illegal on account of the infraction. Any such attempt to construe and apply federal law ... would constitute an impermissible intrusion into regulatory jurisdiction of the National Labor Relations Board under [29 U.S.C. § 158(d) ]." *Id.* at 293, 485 A.2d at 369. To understand the Supreme Court's ruling in *Penflex* is to perceive the narrow basis on which it was decided and to perceive that it does not support Employer's argument in the case sub judice that the *Garmon* pre-emption rule governs its outcome. The *Penflex* court merely held that it would not carve out an exception to the Law to hold, as the employer requested, that where striking employees participate in a strike that may be held illegal under federal law, the employees are automatically ineligible for unemployment compensation benefits under the Law.

overtime en masse. A similar situation arose in *Miceli v. Unemployment Compensation Board of Review*, 519 Pa. 515, 549 A.2d 113 (1988). In that case the employer instituted a work stoppage after employees refused to perform overtime work.. The Board concluded that the work stoppage was a strike rather than a lockout, and this Court affirmed. The Supreme Court reversed, reasoning that overtime work was voluntary under the pre-existing terms and conditions of the employment and that the unusually high refusal of overtime after the contract expired did not establish a change in the status quo. As in *Miceli*, overtime work was voluntary under the pre-existing terms and conditions of Claimant's employment; thus Employer cannot prevail on the mere assertion that the Union changed the status quo when its members refused overtime.

Employer points to a Contract provision which prohibits the Union or any of its members from taking any action to prevent employees from working overtime, and it argues that the Union altered the status quo by actively discouraging employees from working overtime. The Board rejected this argument, explaining that Employer "has not shown that the union orchestrated the refusal of overtime." [4] Board's decision, p. 4. Employer maintains that this finding capriciously disregards competent evidence. In particular, Employer relies upon records showing a precipitous decrease in overtime immediately after the Contract expired. Employer also produced the testimony of a supervisor who overheard one employee discourage another from working overtime.[5]

As an initial matter, Employer misapprehends this Court's appellate function. The capricious disregard test applies only where the burdened party is the sole party to present evidence but does not prevail before the agency. *See Russell v. Workmen's Compensation Appeal Board (Volkswagen of America)*, 121 Pa.Cmwlth. 436, 550 A.2d 1364 (1988). In this case the Union presented one of its leaders who testified that the Union did not prevent any employee from working overtime and on several occasions during the period in question actually encouraged Union members to accept overtime work. When both parties present evidence on a factual question this Court's review is limited to determining whether the agency's finding is supported by substantial evidence. *Estate of McGovern v. State Employees' Retirement Board*, 512 Pa. 377, 517 A.2d 523 (1986). In this case, the testimony of the Union leader provides substantial evidence in support of the Board's finding.

V.

Employer also argues that the Board's order should be vacated because the referee refused to issue a subpoena requested by Employer. Employer requested that the referee issue a subpoena that would have required the Union to produce virtually every document, record or other "tangible thing" in any manner related to or containing any mention of the labor dispute or the employees' compensation claims. Alternatively Employer requested that the referee issue "a subpoena compelling the production of some documents, if a subpoena compelling the production of all of the documents is not possible." Em-

---

4. Where a work stoppage takes the form of a strike, the claimant ordinarily bears the burden of showing that the employer first refused to continue under the status quo. *Miceli*. It appears that the Board assigned Employer the burden of proving that the Union instigated the refusal to work overtime. Employer, however, does not argue that the Board erred in this regard. Thus the Court will assume for purposes of this opinion that Employer was properly assigned the burden of proving Union orchestration.

5. There is no indication whether either of the employees was involved in the Union's leadership. Further, neither employee was called at the hearing, and thus no explanation for the comments the supervisor overheard appears in the record.

ployer's subpoena request, p. 5. When the referee denied the request entirely, however, Employer accepted the ruling without objection or further comment.

▉▉▉ An unemployment compensation referee is obliged to issue requested subpoenas where the issuance of the subpoena would lead to relevant and probative testimony. *Hamilton v. Unemployment Compensation Board of Review*, 110 Pa. Cmwlth. 384, 532 A.2d 535 (1987). The referee, however, has discretion to refuse issuance when the referee finds that the subpoena is being requested for purposes of harassment or to commence a fishing expedition. *Zukoski v. Unemployment Compensation Board of Review*, 106 Pa. Cmwlth. 270, 525 A.2d 1279 (1987). Given the universal character of Employer's request, denial was well within the referee's discretion. Nor did the referee err in declining Employer's invitation to modify the request; it is not the referee's duty to narrow counsel's request. If Employer wished to make a more narrowly tailored request, Employer should have done so when the referee denied its initial request. Instead, Employer merely accepted the ruling without objection and made no attempt to amend its subpoena request.

## VI.

Employer contends that the Board erred in concluding that Employer altered the status quo. Employer first contends that the language of the Contract permitted it to work non-bargaining unit employees in bargaining unit jobs when bargaining unit employees refused overtime work. Article XVIII, § 6 of the Contract provides that supervisory employees "shall not perform any work or operations regularly performed by employees covered by this Agreement, except for the purpose of instructing employees." The section also provides that non-bargaining unit employees "shall not be permitted any work normally performed by employees in the bargaining unit." Employer argues that because Article XVIII, § 6

applies only to work "regularly" or "normally" performed by bargaining unit employees, it does not apply to overtime work that they refuse. This interpretation of the Contract is strained; the overtime work was merely performed during a different time period without any change in the character of the work that would distinguish it from that performed by bargaining unit employees during regular hours.

Regardless of the merits of Employer's contract interpretation, the precise issue before this Court is which party altered the pre-existing terms and conditions of employment and thereby bears responsibility for the work stoppage. *Miceli.* This Court must determine whether Employer altered the pre-existing terms and conditions actually in effect at the last actual, peaceable and lawful, uncontested status that preceded the controversy. *See Fairview School District; Grandinetti v. Unemployment Compensation Board of Review*, 87 Pa.Cmwlth. 133, 486 A.2d 1040 (1985).

▉▉▉ Employer contends that its interpretation of the Contract is consistent with the parties' prior practice under the status quo because Employer used non-bargaining unit employees to perform overtime work when bargaining unit employees refused the overtime while the Contract was in effect. The Union, however, filed multiple grievances when this occurred. Although the Union did not pursue those grievances to arbitration, the Union consistently contested the practice while it was ongoing. Therefore, Employer's use of non-bargaining unit personnel on bargaining unit jobs for overtime work cannot be considered part of the last actual, peaceable and lawful, uncontested status that preceded the controversy. *See Fairview School District* (defining the status quo). Rather, when Employer implemented a strained contract interpretation that it knew the Union had previously contested,

it altered the status quo and became responsible for the ensuing work stoppage.

Finally, Employer contends that its use of non-bargaining unit employees cannot be considered an alteration of the status quo because that dispute is grievable, and the Union failed to file a grievance when Employer implemented the practice after the Contract expired. Employer asserts that the failure of the Union to file a grievance amounted to its violation of the status quo in that the expired contract contained procedures which the Union was required to invoke before it could claim a lockout. In *Grandinetti* this Court held that "for unemployment compensation purposes, the filing of a grievance is not a condition precedent to a Union's claim of a lockout during the interim bargaining period, when the employer and Union are working under an extension of the terms of the expired agreement." *Id.* at 1044. It explained that a Union "has the right to resort to the grievance procedure for alleged contract violations which take place during the interim period" but that the Union has no duty to utilize that right. *Id.* Moreover, the Court clearly articulated that the "de minimis rule" is no defense to a claim that an employer has violated the status quo.

Recently, in *Hopkins v. Unemployment Compensation Board of Review,* 707 A.2d 1169 (Pa.Cmwlth.1998), *appeal denied,* 555 Pa. 723, 724 A.2d 937 (1998), a panel of this Court reached a contrary result. Despite recognizing the continuing vitality of *Grandinetti,* the *Hopkins* panel held that employees who cease work because of an alleged breach of contract during an interim bargaining period are not entitled to compensation where the collective bargaining agreement provides a grievance proce-

dure for the settlement of such disputes. In reaching this conclusion, the panel followed *Westinghouse Electric Corporation v. Unemployment Compensation Board of Review,* 187 Pa.Super. 391, 144 A.2d 673 (1958). Although *Westinghouse* involved a work stoppage that occurred before the agreement expired, the panel concluded that the rule announced therein should be applied by this Court in the interim bargaining context.[6]

■ The *Vrotney* test is designed to further the Law's principal objective to relieve economic distress in individual cases where employees become unemployed through no fault of their own. *See Odgers.* When an employer unilaterally changes the status quo, work under the pre-existing terms and conditions is no longer available to the employees, and the employer is responsible. *Vrotney.* Employees are faced with two choices: "to work under the unilaterally imposed, changed conditions, or to withhold their services." *Odgers,* 514 Pa. at 393, 525 A.2d at 366. The Supreme Court has never "held that an employee must choose the former course in order to preserve entitlement to benefits" and has expressly declined to do so. *Id.*

The *Hopkins* decision, however, would require every employee who works under a contract with grievance procedures to make the former choice or forfeit benefits whenever his or her employer justifies its unilateral change with a contract interpretation. This mandate is contrary to the principles espoused in *Vrotney,* and because the Supreme Court has expressly declined to place such a burden on an employee's choice, this Court may not do so either.[7] The *Hopkins* decision cannot

**6.** In both *Hopkins* and *Grandinetti* the parties had agreed to continue working under the terms of the expired agreement during negotiations, and both cases involved a dispute over the interpretation of the terms of the extended contract. With regard to work stoppages that occur before the governing agreement expires, this Court has even held that employees

are not required to pursue an available grievance remedy to preserve their right to compensation when the employer severely breaches the agreement. *Murdoca v. Unemployment Compensation Board of Review,* 122 Pa. Cmwlth. 303, 551 A.2d 1157 (1988).

**7.** Because the Court concludes that Employer altered the status quo on the first of the enu-

be reconciled with *Grandinetti,* and because it conflicts with well established and clearly enunciated precedent of both this Court and the Supreme Court, it is therefore overruled. For the foregoing reasons, the order of the Board is affirmed.

### *ORDER*

AND NOW, this 25th day of October, 1999, the order of the Unemployment Compensation Board of Review is affirmed.

Judge KELLEY dissents.

merated grounds, there is no need for extensive discussion of the latter two. With regard to the career center, Employer argues that it was not required by the Contract and that all intended beneficiaries of the center had received counseling. Even if the center was not established pursuant to a contract term, it was part of the pre-existing terms and conditions of employment at the last actual, peaceable and lawful, uncontested status that preceded the controversy, and its unilateral closing altered the status quo.

*Grandinetti.* With regard to the transfer of Ronald Duffield, Employer argues that Article V, § 16 of the Contract allowed it to temporarily transfer employees. That provision, however, required prior Union approval before interdepartment temporary transfers to a job classification from which an employee had been laid off. Thus Employer altered the status quo when, without prior Union approval, it temporarily transferred Mr. Duffield back to the department from which all employees had been laid off.