598 A.2d 1351

The ALL AMERICAN GOURMET COMPANY, Petitioner,

v.

UNEMPLOYMENT COMPENSATION BOARD
OF REVIEW, Respondent.

Commonwealth Court of Pennsylvania.

Argued April 5, 1991.

Decided Nov. 1, 1991.

Lisa Bazemore, for petitioner.

John E. Herzog, Asst. Counsel, for respondent.

James R. Reehl, for intervenor, Marcia L. Levine.

Before DOYLE and COLINS, JJ., and BARBIERI, Senior Judge.

BARBIERI, Senior Judge.

The All American Gourmet Company (Employer) petitions this Court to review a decision of the Unemployment Compensation Board of Review (Board) which reversed a referee's decision and granted Marcia L. Levine (Claimant) benefits pursuant to Section 402(d) of the Unemployment Compensation Law (Law), Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(d).[1]

Employer and Claimant's union were parties to a three year collective bargaining agreement (agreement). Article XXXII, paragraphs 32.1 and 32.2 of that agreement provided:

> This Agreement shall become effective as of November 3, 1986, and remain in full force and effect until midnight, October 5, 1989, and shall automatically renew from year to year thereafter unless at least sixty (60) calendar days before the termination date either party gives written notice to the other of a desire to amend or terminate the Agreement.

> If written notice is given by either party, as set forth above, and the parties fail to achieve a mutually satisfactory agreement by the termination date, this Agreement

---

1. Section 402(d) provides in pertinent part:
   An employe shall be ineligible for compensation for any week—
   (d) In which his employment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed ...

will continue in full force and effect until such time as either party gives notice to terminate the Agreement by ten (10) calendar days written notice.

Pursuant to paragraph 32.1 of the agreement, the union gave the required sixty day termination notice. Thereafter, Employer and the union began negotiating in an effort to arrive at a new agreement.

One of the key issues discussed by the parties in their negotiations was the union's major dissatisfaction with Employer's no-fault attendance program. Under that program, employees were assessed a point for each absence or partial absence, regardless of the reason, unless the absence fell under one of Employer's exceptions. Employees who accumulated six or more points for absenteeism were subject to discharge. The union insisted that Employer bargain with it over the point system of the attendance program. Employer, on the other hand, refused to bargain over the attendance program because it felt it had a right, under the management rights clause of the agreement,[2] to unilaterally make and enforce the rules of the program.

When the parties could not reach a new agreement, the union, in a letter dated October 2, 1989, advised Employer, in accordance with paragraph 32.2 of the agreement, of its intent to terminate the agreement. Nevertheless, the parties continued to work and continued to negotiate.

During the course of one of these negotiation sessions, Employer advised the union that it planned to revise its current attendance program to include a general amnesty,

2. The management rights clause, located in Article II, paragraphs 2.1–2.3, provided in pertinent part:

The Company maintains the sole and exclusive right to manage its business and to direct the working force, including the right to . . . make and enforce reasonable plant rules of conduct and regulations not inconsistent with the provisions of this Agreement. . . .

The foregoing enumeration of management rights shall not be deemed to exclude other rights or functions not specifically set forth; and the Company, therefore, retains all other such rights not specifically limited by the terms of this Agreement. The provisions of this Article are subject to, and cannot conflict with, the other express provisions of this Agreement. . . .

or removal of points, on each employee's record, to be effective November 1, 1989. The union did not agree with the revised attendance program which Employer intended to implement. It did, however, express concerns about the status of employees who had already accumulated the maximum amount of points, but had not yet been fired. In an effort to alleviate the union's concerns, Employer promised an additional amnesty, effective October 13, 1989, to all employees on the payroll, thereby eliminating the possibility that employees who had accumulated the maximum allowed points would be fired.

On October 16, 1989, the union and its members instituted a work stoppage and established picket lines. Soon afterwards, members of the union filed applications for unemployment benefits. To facilitate the disposition of these multiple applications, the parties agreed that the claims of two token claimants [3] were representative of the issues involved and that the final decisions rendered on the token claims would constitute precedent for the disposition of the other claims.

On February 6, 1990, the Office of Employment Security (OES) determined that Claimant was ineligible for benefits, since the work stoppage was a labor dispute other than a lockout. On appeal, the referee affirmed OES's decision on the ground that Claimant was unemployed due to a strike. Upon further appeal, the Board reversed. The Board found that the agreement between the parties had terminated on October 5, 1989. Moreover, the Board found that on October 13, 1989, Employer had unilaterally implemented its amnesty program. Because it was Employer who first altered the status quo by granting amnesty, the Board concluded that, according to case law, the work stoppage was a lockout and, therefore, Claimant was entitled to unemployment benefits. This petition for review

---

3. Out of the two token claimants, Claimant herein became the lead token claimant.

followed.[4]

The dispositive issue for purposes of determining eligibility for unemployment benefits under Section 402(d) of the Law, 43 P.S. § 802(d), is whether the work stoppage by the union members constituted a "strike" or resulted from a "lockout" by Employer. In the former situation, Claimant and her fellow employees would be ineligible for benefits, while in the latter situation, Claimant and her fellow employees would be eligible to receive unemployment benefits.

The test for determining whether a work stoppage is the result of a "strike" or a "lockout" was established in *Vrotney Unemployment Compensation Case*, 400 Pa. 440, 163 A.2d 91 (1960). In that case, our Supreme Court delineated the test as follows:

> Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the preexisting terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout' and the disqualification for unemployment compensation benefits in the case of a 'stoppage of work because of a labor dispute' does not apply.

*Id.*, 400 Pa. at 444–445, 163 A.2d at 93–94.

Later, in *Philco Corporation v. Unemployment Compensation Board of Review*, 430 Pa. 101, 242 A.2d 454 (1968), the Supreme Court refined that test. Therein, the Court stated:

4. This Court's scope of review is limited to determining whether an error of law was committed, whether the Board's necessary findings of fact were supported by substantial evidence, or whether the petitioning party's constitutional rights were violated. *Kirkwood v. Unemployment Compensation Board of Review*, 106 Pa. Commonwealth Ct. 92, 525 A.2d 841 (1987).

Since the purpose of our unemployment compensation system is to compensate an individual when work has been denied him through no fault of his own, logically the test of whether a work stoppage resulted from a strike or a lock-out requires us to determine which side, union or management, first refused to continue operations under the status quo after the contract had *technically* expired, but while negotiations were continuing.

*Id.*, 430 Pa. at 103, 242 A.2d at 455 (emphasis added).

Here Employer asserts that the Board erred in determining that, by granting amnesty on October 13, 1989, it changed the status quo after the agreement had expired. It is Employer's position that, under paragraph 32.2 of the agreement, the parties' agreement terminated on October 15, 1989. As such, Employer contends that the grant of amnesty was nothing more than an exercise of its management rights during the term of the agreement, rather than a change in status quo after the agreement had terminated.

From our reading of paragraphs 32.1 and 32.2 of the agreement, we agree with the Board[5] that the agreement

---

5.  Contrary to Employer's contention, we hold that the Board did make a specific finding regarding the date when the agreement terminated. Specifically, the Board found:

    2.  Production Workers employed by the employer are represented by the Union and a labor/management agreement effective November 3, 1986, had been entered into by the employer and the Union *with said agreement having a termination or expiration date on October 5, 1989, at midnight.*

    13.  No new labor/management agreement was reached by midnight of October 5, 1989, and thereafter work continued under the terms and conditions of the *expired* labor/management agreement and the parties also continued to negotiate.

    Findings of Fact Nos. 2 and 13 (emphasis added). The fact that the Board did not explicitly set forth any analysis for this finding is of no consequence. The Board simply believed that paragraph 32.1 of the agreement spoke for itself and that paragraph 32.2 of the agreement did not affect the agreement's technical termination date.

    Likewise, we do not believe that the Board abused its discretion in denying Employer's motion to reopen the record for the taking of additional evidence as to the interpretation of paragraph 32.2 of the agreement. As Employer states in its brief, the additional evidence "would [merely] have lent further support to its argument that the Agreement did not expire until October 15, 1989." Employer's brief, p. 28. Since that interpretation was already before the Board, the

technically terminated on October 5, 1989. Paragraph 32.1 of the agreement clearly sets forth that the duration of the agreement was from November 3, 1986 through midnight, October 5, 1989. In addition, the title page of the agreement very explicitly provides that the technical termination date of the agreement is October 5, 1989. Paragraph 32.2 of the agreement, on the other hand, merely acts to extend the agreement "until such time as either party gives notice to terminate the Agreement by ten (10) calendar days written notice." That provision, while acting to extend the terms and conditions of the expired agreement, does not extend the technical termination date of the agreement.[6] As such, we hold that the agreement technically terminated on October 5, 1989.

Employer next argues that, even if its grant of amnesty occurred after the agreement had technically expired, the Board erred in determining that this action constituted a change in the status quo. It is Employer's position that because the grant of amnesty was an exercise of its management rights as defined in the agreement, it constituted a manifestation of, rather than a change in, the status quo.

The status quo has been defined as the last actual, peaceable, and lawful noncontested status which preceded the controversy. *Fairview School District v. Unemployment Compensation Board of Review*, 499 Pa. 539, 454 A.2d 517 (1982). We have held that maintenance of the status quo is merely another way of stating that the parties must continue the relationship *as it existed* at the expira-

Board did not abuse its discretion in not reopening the record to allow for further evidence on the subject.

6.  Even if we were to conclude that paragraph 32.2 of the agreement extended the technical termination date of the agreement, which we do not believe to be so, it would be immaterial to our discussion here, since, in our reading of that provision, the termination date for the agreement would then have been ten days from the date of written notice, not ten days from the date that the agreement was scheduled to terminate. Provided that were the case, the termination date of the agreement herein would have been October 12, 1989, which is still prior to Employer's grant of amnesty.

tion of their agreement. *Grandinetti v. Unemployment Compensation Board of Review,* 87 Pa. Commonwealth Ct. 133, 486 A.2d 1040 (1985).

Even though Employer might have had the right, pursuant to the management rights clause in the agreement, to unilaterally make and enforce reasonable plant rules of conduct and regulations during the course of the parties' agreement, once that agreement expired, a status quo was established from which even the smallest change is considered a disruption of the status quo. *Id.* It does not matter that the established status quo is more restrictive on the parties' ability to change certain conditions of the agreement than the expired agreement. *Id.* Consequently, Employer's October 13, 1989 grant of amnesty, even if made pursuant to its management rights clause, still constituted a change in the established status quo.[7]

■ Employer also asserts that its grant of amnesty under its attendance program did not constitute a change in the status quo, since its attendance program was not a term or condition of employment in the agreement. While we agree that Employer's attendance program was not specifically a part of the parties' expired agreement, it appears to have been a term or condition of employment which had its genesis in and was governed by the agreement. For example, since the attendance program was, for all intents and purposes, a disciplinary rule, it most definitely can be categorized as a term or condition of employment. More-

7. We find no merit to Employer's contention that its grant of amnesty did not change the status quo because it had absolutely no effect on the *terms* of the attendance policy. As previously noted, *any* change, no matter what it is, is considered a disruption of the status quo.

Furthermore, we reject Employer's contention that its decision to grant amnesty was inherently managerial. Simply because Employer had the right, under the management rights clause of the parties' agreement, to unilaterally make and enforce the rules of its attendance program does not mean that anything done pursuant thereto is "managerial." To the contrary, since Employer's actions here affected the terms of employment, they can not be considered inherently managerial. *Grandinetti; see also* Section 702 of the Public Employe Relations Act, Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. § 1101.702.

over, before the agreement had terminated, employees who had been discharged for excessive absenteeism under the program, were allowed to grieve their discharge through the grievance system. This fact, in and of itself, demonstrates that both parties considered the attendance program to be a term or condition of employment under the agreement.

Employer next argues that its grant of amnesty should not have constituted a change in the status quo, since it merely did what the union wanted it to do. In other words, it is Employer's position that, since its grant of amnesty had a beneficial effect on the members of the union, it should not have constituted a change in the status quo.

A similar argument was rejected by our Supreme Court in *Local 730, United Association of Journeymen and Apprentices of the Plumbing and Pipe-Fitting Industry v. Unemployment Compensation Board of Review*, 505 Pa. 480, 480 A.2d 1000 (1984). In that case, the Court held that even a change made by the employer which was beneficial to the union members would still be considered a disruption of the status quo, since the alteration of any condition of employment, whether beneficial or detrimental, may be used as leverage in the negotiation process, to the disadvantage of the other party.

Here, while the union might have expressed concern for the few employees who had accumulated enough points to be discharged, it did not, nor could it, make Employer implement its grant of amnesty. As Employer continuously reminds us in its brief, it was the only one who could make any changes in its attendance program.[8] Simply because this change benefited the members of the union does not mean that it did not constitute a change in the status quo. *Id.*

---

**8.** We find Employer's grant of amnesty to be a change in its attendance program, rather than simply a decision not to discipline under the program, as Employer asserts.

■ Finally, Employer argues that its grant of amnesty should not be considered a change in status quo, since there was no causal connection between its action and the work stoppage. It is hard for us to ascertain how Employer could argue that there was no causal connection between its alleged change in the status quo and the work stoppage. As previously noted, one of the key issues about which the parties were negotiating was Employer's attendance program. Simply because the union members instituted a strike after they were granted amnesty does not indicate that no causal relationship existed. In any event, we do not read any of our Supreme Court's cases as requiring a causal connection between the alleged change in the status quo and the work stoppage. All that must be decided in work stoppage cases for purposes of unemployment compensation benefits is the simple factual question of which party first departed from the terms of the agreement as they existed when the agreement expired. *Local 730; Grandinetti.*

Having found no error in the Board's decision, we affirm.[9]

DOYLE, J., dissents.

## ORDER

AND NOW, this 1st day of November, 1991, the order of the Unemployment Compensation Board of Review in the above-captioned proceeding is hereby affirmed.

**9.** We note that we do not find the Board's Finding of Fact No. 25, to wit, that employees, who returned to their jobs after the work stoppage, continued to work under the terms and conditions of the expired agreement, to be inconsistent with its conclusion that the stoppage was a lockout rather than a strike. Since Employer's attendance program was not an explicit part of the parties' expired agreement, the Board's finding is literally correct. The attendance program, however, was a term and condition of employment and, therefore, was part of the status quo.