633 A.2d 1339

NEW CASTLE AREA SCHOOL DISTRICT, Petitioner,

v.

UNEMPLOYMENT COMPENSATION BOARD
OF REVIEW, Respondent.

Commonwealth Court of Pennsylvania.

Argued June 14, 1993.

Decided Nov. 12, 1993.

Dominick Motto, for petitioners.

Randall S. Brandes, for respondent.

Michael I. Levin, for amicus curiae Pa. School Boards Ass'n.

Before COLINS and McGINLEY, Judges, and LORD, Senior Judge.

COLINS, Judge.

The New Castle Area School District (School District) petitions for review of a decision and order of the Unemployment Compensation Board of Review (Board) affirming the referee's decision that John J. Schultz, as an individual (Claimant), and as the representative of similarly situated employees of the School District (claimants), who are also members of the New Castle Federation of Teachers, PAFT, AFT, AFL–CIO, Local Union No. 3975 (Union), was eligible to receive unemployment compensation benefits (benefits). Claimant, employed by the School District for 26.5 years as a teacher at Benjamin Franklin Junior High School, has been and remains a Union member. He is also the representative claimant in the Union's collective appeal, filed on behalf of bargaining unit members who were similarly denied benefits in individual determinations by the Office of Employment Security (OES), for compensable weeks ending September 29 and thereafter, pur-

suant to Section 402(d) of the Unemployment Compensation Law (Law).[1]

Throughout March of 1990, the School District and Union negotiated in an unsuccessful effort to reach a new labor/management agreement (agreement) before expiration of the existing agreement (Agreement) on September 1, 1990 at 12:01 a.m. Having failed to meet this deadline, both the School District, by written offer, and the Union, by verbal offer, expressed willingness to continue working during the new school year, commencing September 4, 1990, under the terms and conditions of the expired Agreement, while continuing negotiations for the agreement. The School District's written offer provided for indefinite extension of the Agreement with all its terms and conditions (including salaries and fringe benefits) to remain in place and provided that claimants would keep their salary level as of the Agreement's expiration date. Although the Union made no specific response to the School District's written offer, claimants reported to work as usual on September 4, 1990.

The following three developments, however, precipitated a teacher work stoppage on September 19, 1990. First, the Agreement gave the School District authority to determine class schedules, hours of instruction, and related matters within the teachers' work day, which was fixed at 7.25 hours. The 7.25 hour day included six 50–minute class periods, a 26–minute activity period, and a 30–minute lunch period. The foregoing scheduling remained in effect at eight of the School District's nine school sites; however, at Claimant's school, the School District unilaterally implemented a new class schedule consisting of seven 44 minute class periods and a 25 instead of a 26–minute activity period. The total 7.25 hour work day,

---

1. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(d), which provides, in pertinent part:

An employe shall be ineligible for compensation for any week—

. . . .

(d) In which his unemployment is due to a stoppage of work, which exists because of labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed. . . .

30–minute lunch period, and teachers' starting and quitting times remained the same. Although the Union filed an unfair labor practices charge with the Pennsylvania Labor Relations Board (PLRB) challenging the scheduling changes, the PLRB, on October 21, 1990, sustained the School District's legal and contractual authority to make these changes.

The second situation contributing to the work stoppage centered around claimants' (acting through a faculty committee for each school building) operation and maintenance of food and beverage machines in faculty lounges, subject to approval as provided for in the Agreement. Pursuant thereto, the faculty committee had the right to: select a vendor; secure the specific type of machine; independently negotiate the contract terms and amount of profit for the machine; and receive a portion of the proceeds therefrom. The record indicates that in direct contravention of the foregoing, the School District, on May 15, 1990, passed a resolution directing that only one vendor was to be used and that only Coca–Cola machines were to be installed in its school buildings. This required removing a Pepsi Cola machine from one school, which was ultimately reinstalled, on or about September 24, 1990, during the work stoppage.

The third factor leading to the work stoppage concerned claimants' pay scales. The Agreement provided for a system of incremental pay increases for claimants based both on longevity (years of service) and on academic credits received for additional educational courses and advanced degrees. Pursuant to the School District's written offer to continue school operations under the Agreement's terms, no salary increases were to be effectuated until an agreement was reached. Nevertheless, the first paycheck issued to claimants on September 21, 1990, indicated that the School District paid increments to those claimants who had earned educational credits but not to the larger group of claimants who had earned similar increments on the basis of longevity.

Claimants' work stoppage went into effect on September 19, 1990 and ended on December 5, 1990, at which time the School District and the Union still had not reached an agreement.

Nevertheless, claimants returned to work under the same terms and conditions as existed on their last workday prior to the stoppage.

Claimant filed for compensation benefits, and OES made a determination granting Claimant benefits for a compensable week ending September 22, 1990, while denying him benefits for the compensable weeks ending September 29, 1990 and thereafter, pursuant to Section 402(d) of the Law, 43 P.S. § 802(d). Claimant appealed this determination and, after a hearing at which Claimant, another Union representative, and School District representatives testified, the referee concluded that the School District had changed the status quo during contract negotiations, thereby creating a "lockout" per Section 402(d) of the Law. Accordingly, the referee's order: (1) affirmed the OES determination that under Section 402(d) of the Law, Claimant was eligible for benefits for the week ending September 22, 1990; and (2) reversed the OES determination that Claimant was ineligible for benefits for the week ending September 29, 1990, and thereafter, through the week ending December 8, 1990.

The School District appealed the referee's decision to the Board which, by decision and order dated October 2, 1992, affirmed the referee's determination. The School District now petitions for our review of the Board's decision. "This Court's scope of review of the Board's decision is limited to determining whether the findings of fact are supported by substantial evidence, whether errors of law were committed, or whether constitutional rights were violated." *Stanley Flagg and Co., Inc. v. Unemployment Compensation Board of Review*, 146 Pa.Commonwealth Ct. 248, 250, 605 A.2d 443, 444, *petition for allowance of appeal denied*, 532 Pa. 648, 614 A.2d 1144 (1992).

The following issues for our determination are: (1) whether the Board erred in affirming the referee's decision that the School District disrupted the status quo by contravening the terms and conditions of the Agreement which, by the School District's own representations, were to remain in effect during contract negotiations; and (2) whether the Board erred in affirming the referee's conclusion that the School District, by

disrupting the status quo, created a "lockout" situation per Section 402(d) of the Law which, rather than a "strike" by claimants, was responsible for the work stoppage, thereby rendering claimants eligible for benefits.

The School District argues that it did not disrupt the status quo by changing the number of class periods at one of its nine school sites, because this action was solely "administrative" in nature and was not a topic covered by the Agreement. In any event, the School District maintains that establishing the number of class periods per day is part of its managerial prerogative and does not fall within the ambit of collective bargaining.

Additionally, the School District argues that it did not order removal of the Pepsi–Cola machine at one of its schools but, rather, that the principal thereof misinterpreted the School District's authorization of a contract for Coca–Cola machines as *requiring* removal of the school's already existing Pepsi–Cola machine. The subject Pepsi–Cola machine was subsequently reinstalled and, therefore, argues the School District, this incident cannot be said to have upset the status quo that followed expiration of the Agreement.

Further, the School District denies that it upset the status quo by paying earned incentive salary increments for educational credits, because the foregoing were *owed* by the School District to claimants who had expended their own time and money and which, under the Agreement, *had to be paid* by September 21, 1990. The School District distinguishes the foregoing salary increases from longevity-based increments, referring to the latter as a "built in escalator" for which claimants provided nothing additional to what was already contractually required.

Peripherally, we note that the Pennsylvania School Boards Association filed an amicus curiae brief in support of the School District's position and advocated the need for this Court to set forth clearly delineated standards of what conduct constitutes disruption of the status quo in a work stoppage situation such as the present one.

Upon review, we find that substantial evidence of record supports the decision of both the referee and the Board that the School District engaged in conduct that unarguably disrupted the status quo, which both sides agreed would remain in place while they negotiated an agreement. Specifically, the Board made the following relevant findings of fact:

## FINDINGS OF FACT

13. For the 1989–90 school year the employer had established a work day of 7¼ hours and encompassed within said work day were six, 50–minute class periods, a 26–minute activity period, and a 30–minute lunch period.

14. When classes resumed on September 5, 1990, this scheduling remained unchanged at eight of the employer's nine school locations but at one location, the Benjamin Franklin Junior High School, the class scheduling had been changed for the 1990–91 school year.

15. At this school the employer had unilaterally implemented a new class schedule consisting of seven 44–minute class periods and a 25–minute activity period instead of the prior 26–minute activity period.

. . . .

18. Pursuant to the labor/management agreement, bargaining unit employees, through a separate faculty committee for each building, were permitted, provided their request was approved, to operate and maintain food and beverage machines in the teacher lounges.

19. This was done at some schools and more specifically a faculty committee had requested permission, the same was granted, and the committee had entered into a contract with a vendor of Pepsi Cola vending machine [sic] for installation of such a machine at the Lockley Primary Center, and this arrangement existed throughout the 1989–90 school year.

. . . .

21. The employer wanted to deal with just one vendor or supplier and more particularly only wanted Coke machines established in its school buildings and toward that purpose the school board passed a resolution on May 15, 1990, authorizing such an arrangement to be finalized.

22. The principal at the Lockley School directed the faculty committee to remove the Pepsi machine and advised them that the employer would be installing its own machine.

. . . .

24. The status quo with regard to the vending machine consisted of several elements including the right to choose a vendor, to independently negotiate the contract with respect to the terms and amount of profit, to secure the particular type of machine, and receive a share of the proceeds from such machines. These conditions were bargained for under the expired contract.

25. Subsequently, a Pepsi Cola machine was reinstalled in the faculty room at the direction of the employer on or about September 24, 1990.

. . . .

31. The teachers, either three or four in number who were entitled to an earned incentive incremental pay increase because of additional college credits or degrees, that had been earned as of August 31, 1990, were paid their regular salaries plus the increments due them.

32. The teachers, some 46 in number, who were entitled to salary increments because of longevity, based on an increase in the years of service, did not receive these increases in their September 21, 1990 pay, as the employer had decided to pay them exactly what they had received during the 1989–90 school year and had decided not to pay any increments based on longevity.

We find that the legal conclusions presented for our review are supported by the foregoing factual findings made

by the Board, which "is the ultimate finder of fact and determiner of credibility [, whose] decision must be affirmed if supported by substantial evidence." *Grimm v. Unemployment Compensation Board of Review,* 127 Pa.Commonwealth Ct. 368, 377, 561 A.2d 1286, 1290 (1989). We further concur with the Board's well-reasoned determination that the School District's upsetting the status quo caused the work stoppage. The Board states:

> In the opinion of the Board, this matter is indeed comparable to the decision of the Commonwealth Court in *All American Gourmet Company v. Unemployment Compensation Board of Review,* [143] Pa.Commonwealth Ct. [330], 598 A.2d 1351 (1991). As noted in the previous findings the employer made a uni-lateral [sic] change in class scheduling at the Benjamin Franklin Junior High School and this change was effective September 5, 1990, and the change was made by the employer pursuant to the management rights it had. In *All American Gourmet,* as here, the employer was exercising its management rights, after the expiration of the labor/management agreement, and made an amnesty grant to some employees who would, otherwise, have been subject to discharge because of their absenteeism. This amnesty grant, actually, was for the benefit of the employees involved, but the Court, regardless, held this was a change in the status quo that made the work stoppage a lockout rather than a strike ... and benefits were awarded to the bargaining unit employees pursuant to the lockout exception in Section 402(d).

Determining "whether a work stoppage is a lockout or a strike is crucial to the award of benefits." *Murdoca v. Unemployment Compensation Board of Review,* 122 Pa.Commonwealth Ct. 303, 309, 551 A.2d 1157, 1160 (1988). In reaching this decision, we repeatedly have had to resolve the issue of whether the work stoppage was caused by management or by the union, which in and of itself is a mixed question of law and fact requiring our "independent determination." *Id.* at 309, 551 A.2d at 1160.

A labor situation remarkably analogous to the present case arose in *Miceli v. Unemployment Compensation Board of Review,* 519 Pa. 515, 549 A.2d 113 (1988), wherein the issue for the Supreme Court's determination was whether a work stoppage during the negotiation period after a prior agreement's expiration and before the signing of a new agreement, was a lockout or a strike. In *Miceli,* Quaker Oats Company (Employer) and its union were parties to two collective bargaining agreements that had expired while negotiations were in process for a new agreement. During the negotiation period, Employer began to require its employees to work overtime, which requirement precipitated a work stoppage. The court found that Employer therein was the first to change the status quo, thereby creating a lockout,[2] and that, therefore, claimants were eligible to recover benefits.

The *Miceli* rationale was recently reaffirmed in *Schulmerich Carillons, Inc. v. Unemployment Compensation Board,* 154 Pa.Commonwealth Ct. 343, 345, 623 A.2d 921, 923 (1993), as follows:

Section § 402(d) of the Unemployment Compensation Law provides that employees who are unemployed because of a labor dispute are entitled to unemployment compensation benefits only if the work stoppage is due to a lock-out. The referee, relying on The Vrotney Unemployment Compensation Case, 400 Pa. 440, 163 A.2d 91 (1960) and Philco Corp. v. Unemployment Compensation Board of Review, 430 Pa. 101, 242 A.2d 454 (1968), determined that the work stoppage was due to a lock-out and not a strike. Under Vrotney and Philco, the question in determining whether a work stoppage is a strike, attributable to the employees, or a lockout, attributable to the employer, is which party first refused to continue operations under the status quo after the contract technically expired. *More recently this court has reaffirmed the rule that any change in the status quo by the employer constitutes a lock-out.* Portec v. Unem-

2. The term "lockout" has been defined as "the last actual peaceable uncontested status that preceded the work stoppage." *Murdoca,* 122 Pa.Commonwealth Ct. at 310–11, 551 A.2d at 1161.

ployment Compensation Board of Review, 104 Pa.Commonwealth Ct. 629, 522 A.2d 1180 (1987). (Footnote omitted.) (Emphasis added.)

Indeed, the fact that the actions taken by the School District in the present matter could be deemed de minimis in nature does not vitiate the resultant change they made to the status quo. *Chichester Area School District v. Unemployment Compensation Board of Review*, 53 Pa.Commonwealth Ct. 74, 415 A.2d 997 (1980). Considering the case *sub judice* in light of the foregoing precedent, the School District, in violation of its understanding with the Union, unequivocally and unilaterally effectuated multiple changes in the status quo by: altering class schedules at one of its nine schools; paying certain teachers salary increments based on academic credits while not paying increments to others based on longevity; and authorizing Coca-Cola machines, when the selection of faculty lounge beverage machines was to be made by a designated faculty committee. We therefore concur with the Board's finding that the School District's actions caused the work stoppage which, therefore, can only be deemed a lockout.

Accordingly, the Board's order, finding both the representative Claimant and the claimants as a class eligible for benefits, is affirmed.

## *ORDER*

AND NOW, this 12th day of November, 1993, the order of the Unemployment Compensation Board of Review in the above-captioned matter is affirmed.