Michael **HOPKINS** and Arthur **Clark, Petitioners,**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 8, 1997.

Decided Jan. 9, 1998.

Robert D. Mariani, Scranton, for petitioners.

Michael I. Levin, Huntingdon, for intervenor, Pittston Area School District.

Before COLINS, President Judge, FLAHERTY, J., and NARICK, Senior Judge.

NARICK, Senior Judge.

The issue presented on appeal is whether the Unemployment Compensation Board of Review (Board) erred by finding that the Pittston Area School District (District) did not depart from the status quo where the parties agreed to continue working under an extension of their old collective bargaining agreement while negotiations for a new collective bargaining agreement continued.

Michael Hopkins and Arthur Clark (Claimants) are token unemployment compensation claimants who represent the members of the Pittston Area Federation of Teachers (Union). Claimants appeal the Board's order that denied benefits for the entire period of work stoppage because the Board concluded that Claimants' unemployment was the result of a strike rather than a lockout under Section 402(d) of the Unemployment Compensation Law (Law).[1]

The District and the Union were parties to a collective bargaining agreement that expired on June 30, 1995. In January 1995, the parties began negotiations for the purpose of reaching a successor agreement, but no new agreement was reached as of the expiration date. However, the parties agreed to continue working under the terms and conditions of the expired collective bargaining agreement that was extended until the parties reached a new agreement. The parties worked the entire 1995–1996 school year under the extended agreement. When the 1996–1997 school year began, the District's teachers again reported to work under the terms and conditions of the extended agreement. On September 20, 1996, the Union notified the District of an imminent work stoppage due to an alleged change in the status quo by the District. The District responded on September 22, 1996 that work would remain available under the terms and conditions of the preexisting contract. Despite the District's offer, the Union initiated a work stoppage on September 23, 1996 that continued until November 5, 1996.

As a result of the work stoppage, Claimants filed for unemployment compensation benefits. The Office of Employment Security denied benefits under Section 402(d) of the Law. On appeal before the referee, both parties presented evidence. At the hearing before the referee, the Union's president testified that the Union initiated a work stoppage because the District allegedly altered the status quo by violating certain provisions of the extended agreement. First, the Union alleged that the District failed to provide three new teachers with activity passes in violation of the activity pass provision. Second, the Union asserted that the District exceeded the class size limits set forth in the agreement. Third, the District allegedly failed to comply with the time requirements set forth in the grievance procedure provisions. Fourth, the Union claimed the District failed to provide the in-school suspension teacher with proper preparation time. Fifth, the Union asserted that the District failed to appoint Claimant Hopkins to the boys basketball coach position in violation of posting provisions.[2]

Based on the evidence presented at the hearing, the referee found that the District did not depart from the status quo with respect to the in-school suspension teacher, the activity passes, or the class size limits. As a result, the referee denied benefits for the weeks ending October 12, 1996 through and including November 9, 1996. However, the referee approved benefits for the weeks ending September 28, 1996 and October 5, 1996 because he found that the District al-

1. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, as amended, 43 P.S. § 802(d).

2. The Union also claimed that the District improperly cancelled health care insurance, but the Board found no alteration of the status quo because the District continued to provide health insurance coverage. The Union does not challenge this finding on appeal.

tered the status quo as to the grievance procedures and basketball coach.

On appeal, the Board determined that the District did not alter the status quo in any way and that the Claimants' unemployment was the result of a strike. In its decision, the Board reviewed the disputed provisions in light of Article 3 of the extended agreement, which provided that the District "shall take no action violative of, or inconsistent with, any provision of this Agreement or any policy or practice governing working conditions of teachers existing on the date of execution of the Agreement." Based on its review of the evidence, the Board found the testimony of the District's witnesses credible[3] and concluded:

> [T]he newly hired teachers did receive their [activity] passes when the employer realized that it had forgotten to send them. Additionally, the employer was responding to the grievances in accordance with past practice in a reasonable period of time. Finally, while the Head Basketball Coach was not re-appointed until October 8, 1996, and while the in-school suspension teacher did not receive his [preparation time], the Board concludes that these are issues that under the terms of the agreement are to be grieved, i.e. issues with regard to the interpretation or application of the agreement.

Thus, the Board reversed the referee's decision granting benefits for two of the weeks and affirmed the referee's decision to deny benefits for the remaining weeks. The instant appeal followed.[4]

Under Section 402(d) of the Law, employees whose "unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out)," are ineligible for unemployment compensation benefits. 43 P.S. § 802(d). To determine whether a work stoppage is the result of a lockout or a strike, we must apply the well-established test set forth by the Pennsylvania Supreme Court in *Vrotney Unemployment Compensation Case*, 400 Pa. 440, 163 A.2d 91 (1960) and *Philco Corporation v. Unemployment Compensation Board of Review*, 430 Pa. 101, 242 A.2d 454 (1968).

In *Vrotney*, the Supreme Court initially asked:

> Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations?

*Vrotney*, 400 Pa. at 444, 163 A.2d at 93. Later, in *Philco* the Supreme Court further refined the strike/lockout analysis:

> Since the purpose of our unemployment compensation system is to compensate an individual when work has been denied him through no fault of his own, logically the test of whether a work stoppage resulted from a strike or a lock-out requires us to determine **which side, union or management, first refused to continue operations under the status quo** after the contract had technically expired, but while negotiations were continuing.

*Philco*, 430 Pa. at 103, 242 A.2d at 455 (emphasis added). The Supreme Court has consistently defined the status quo as "the last actual, peaceable and lawful, noncontested status which preceded the controversy." *Fairview School District v. Unemployment Compensation Board of Review*, 499 Pa. 539, 544, 454 A.2d 517, 520 (1982). The question of whether a work stoppage is a strike or a lockout is a mixed question of fact and law subject to our review. *Hoffman v. Unemployment Compensation Board of Review*, 100 Pa.Cmwlth. 264, 514 A.2d 668 (1986).

■ In the instant case, there is no dispute that both the Union and the District

---

3. As the ultimate fact-finder in unemployment compensation cases, the Board is empowered to resolve conflicts in the evidence and to judge the credibility of witnesses. *Unemployment Compensation Board of Review v. Wright*, 21 Pa.Cmwlth. 637, 347 A.2d 328 (1975).

4. Our scope of review is to determine whether there has been a constitutional violation or an error of law and whether necessary findings of fact are supported by substantial evidence. 2 Pa.C.S. § 704.

agreed to continue working under the terms and conditions of the extended agreement until they reached a new agreement. Although the parties continued to work for more than one year under the extended agreement, the Union eventually initiated a work stoppage at the beginning of the following 1996–1997 school year based on the District's alleged alterations of the status quo. Because Claimants initiated the work stoppage, they had the burden to show that a lockout and not a strike caused the work stoppage. *Miceli v. Unemployment Compensation Board of Review*, 519 Pa. 515, 549 A.2d 113 (1988). The question before us is whether the Board properly determined that the Union failed to prove the District's actions altered the status quo, resulting in a lockout. As stated by the Union in this case, the status quo is unquestionably the terms and conditions of the extended collective bargaining agreement. Thus, we must review the Board's decision in light of the pertinent provisions of the extended agreement.

The Union first argues that the District altered the status quo when it failed to issue activity passes to three new teachers. Article 40 of the extended agreement provides that "[a]ll teachers shall be provided with an activity pass allowing free admission of that employee to all home events of the Pittston Area School District." There is no dispute that the District should have issued the passes to the new teachers. However, the Board found that the passes were not issued because the superintendent's secretary simply forgot to mail the passes. Moreover, the Board found that none of the three teachers were denied access to any activity due to the lack of an activity pass. Finally, the Board found that the District was not notified of the error until after the work stoppage began. When the superintendent learned of the error, his secretary issued the activity passes. Thus, the Board found no change in the status quo as to the activity passes provision.

The Union argues that even a de minimis error by the superintendent's secretary constitutes a change in the status quo under our decision in *New Castle Area School District v. Unemployment Compensation Board of Review*, 159 Pa.Cmwlth. 611, 633 A.2d 1339 (1993). In *New Castle*, we held that the school district unilaterally changed the status quo by altering class schedules at one of its nine schools; by paying certain teachers salary increments based on academic credits while not paying increments to others based on longevity; and by authorizing Coca–Cola machines, when the selection of faculty lounge beverage machines was to be made by a designated faculty committee. Although these changes were de minimis in nature, we concluded that such changes still altered the status quo.

We agree with the Union that a requirement that the Board determine whether a change is de minimis would unnecessarily complicate the Board's compensation decision. *Chichester Area School District v. Unemployment Compensation Board of Review*, 53 Pa.Cmwlth. 74, 415 A.2d 997 (1980) (stating that the adoption of a de minimis rule would undermine the clarity and relative predictability of the *Vrotney/Philco* test). However, we agree with the District that the instant case is distinguishable from *New Castle*, which involved a discernible change in the status quo as a result of the actions of school officials.

Here, the District's failure to issue the activity passes did not result in any change. The secretary's failure to issue the activity passes did not have any effect on the Union or the three teachers. One of the teachers who attended an activity was admitted despite her lack of an activity pass. Moreover, the superintendent issued the activity passes in October 1996 when the error was brought to his attention. There is no evidence in the record to suggest the District purposely acted to withhold the activity passes, nor is there evidence that the three teachers were deprived of any rights due to the lack of an activity pass. The clerical error in this case resulted in no change whatsoever in the status quo. Further, even if the District did violate the activity passes provision of the extended agreement as alleged by the Union, the Union failed to file a grievance as provided in the extended agreement.

Next, the Union argues that the District violated the class size provisions of Article 32 of the extended agreement. Article 32 of the

extended agreement provides that the District will not "arbitrarily increase" class sizes beyond 30 pupils in any class and no ninth grade class will have more than 29 pupils per class up to and including the first day of school. However, Article 32 provides that class sizes shall be governed by such circumstances as "available classroom and instructional space, teacher availability, and the school modernization program." Also, Article 32 provides that "in certain exceptional circumstances where no other solution may be achieved by scheduling, the specific facts . . . shall be reviewed, and a resolution found by and understanding reached between the respective teacher and principal."

Although one teacher had 31 students in her 11th grade English class at the beginning of the 1996–1997 school year, the Board found that classes in 10th, 11th and 12th grades exceeded 30 students in the past. The Board then determined that once the District knew of the excess numbers, the District's past practice was to try to adjust the class sizes. However, the Board also found that past class sizes exceeded 30 pupils even after the District made adjustments. The Board made similar findings with respect to two 9th grade classes.[5] Because class sizes exceeded the maximum limits in prior years, the Board concluded that the District did not alter the status quo.

Based on the language of Article 32 and the past practices, the District argues that the class size goals in the extended agreement are not absolutes and that the parties contemplated some degree of flexibility. We agree. Article 32 provides that the teacher and the principal should resolve problems with excessive class sizes. Moreover, Article 32 provides that the District will not "arbitrarily increase" class sizes beyond 30 pupils. The Board did not find any arbitrary actions on the part of the District in this case.

The Union's own witness, Anne Hrobak, testified that class sizes in prior years exceeded 30 pupils and on those occasions the

teacher and administration would try to make adjustments. Even after adjustments were made in the past, however, Ms. Hrobak admitted that some classes still exceeded the 30–pupil limit. Moreover, Principal Costello testified that class sizes exceeded the maximum numbers in the past as a result of teacher availability and curriculum choices of the students. Superintendent Serino testified that the administration was still trying to adjust the class sizes and that they were handling the situation the same way they handled it in the past. The Union presented no evidence to contradict the fact that past class sizes exceeded the limits set forth in Article 32. Thus, the Board's finding that the District did not change the status quo as to class size provisions was supported by substantial evidence. Again, the Union failed to file a grievance regarding class sizes.

The Union next alleges that the status quo changed when the District did not comply with the meeting and time requirements set forth in the grievance provisions of Article 14 of the extended agreement. The Union filed two grievances on June 24, 1996 and another grievance on July 7, 1996. The Board found that Solicitor Shovlin had responded to all three grievances in writing on September 6, 1996 and had met with the Union as of September 23, 1996. Although the District's responses did not comply with the meeting or time requirements of Article 14, the Board nonetheless looked to Article 3 and concluded that the past practice between the parties permitted the District to respond to grievances within a "reasonable period of time." In light the testimony of the District's officials, the Board found that the District responded to the grievances within a reasonable period of time.

Solicitor Shovlin testified that during his experience as solicitor the Union generally filed a grievance "informally, orally, or in writing" and that the parties traditionally

---

5. The Board specifically found that no 9th grade class had more than 29 students on the first day of school and two 9th grade classes had more than 29 pupils after the first day. The Board's finding as to the first day of school is not supported by the record because the parties stipulated at the hearing before the referee that at least two 9th grade classes, French I and Spanish I, had more than 29 students on the first day. However, the record supports the Board's finding that 9th grade classes exceeded the maximum 29 pupils in past years.

held discussions "sometime thereafter." Solicitor Shovlin also testified that while he was the solicitor the District's responses varied from very prompt to several months based on the particular situation. Moreover, Solicitor Shovlin testified that when grievances were filed during past summers, the parties did not address the grievances until the start of the new school year or later. The Union presented no evidence to contradict these past practices. Based on Solicitor Shovlin's testimony, the Board had substantial evidence to conclude that the parties were handling the grievances in compliance with past practices and the District did not alter the status quo.

Finally, the Union alleges that the District altered the status quo with respect to the in-school suspension teacher and the boys basketball coach position. The Board determined that these two alleged alterations raised "issues with regard to the interpretation or application of the [extended] agreement" that were to be grieved pursuant to the grievance provisions in the extended agreement.[6] The Union argues that the Board's determination is directly contrary to our prior decision in *Grandinetti v. Unemployment Compensation Board of Review*, 87 Pa.Cmwlth. 133, 486 A.2d 1040 (1985), *appeal denied*, 518 Pa. 628, 541 A.2d 1139 (1988).

In *Grandinetti*, the Erie School District elected to change insurance carriers from Blue Cross/Blue Shield (BC/BS) to the Alpha plan during a period when the parties agreed to continue working under the terms of an expired collective bargaining agreement. The school district argued that the terms of that agreement gave the district the ability to change from BC/BS to another carrier that provided equal or greater benefits. The union countered that the district's unilateral change in insurance carriers disturbed the status quo, and so constituted a lockout. We held that the insurance carrier identified in the expired agreement was part of the status quo and the school district could not alter that status quo by changing carriers even though the terms of the agreement may have permitted the change.

In addition, we held in *Grandinetti* that when the parties are working under an extension of the terms of an expired agreement, the filing of a grievance is not a condition precedent to the union's claim of a lockout for unemployment compensation purposes. Instead, we reasoned that the union has a right, rather than a duty, to resort to grievance procedures when faced with an imminent change in the status quo.[7] Based on *Grandinetti*, the Union contends that the Board's decision in this case was clearly erroneous. We disagree.

As to the in-school suspension teacher, the District's superintendent testified that this newly created position in the middle school did not require the same amount of preparation time as regular teaching positions because the in-school suspension teacher did not have a regular roster of students or specific lesson plans. The superintendent further testified that the in-school suspension position was similar to the school nurse and guidance counselors in terms of responsibility and preparation time. Based on the uniqueness of the position, the superintendent testified that he did not believe the agreement required him to assign preparation time for the in-school position.

Moreover, the fact that there are other positions that do not automatically receive the same amount of preparation time as regular teachers supports the District's argument that it did not alter the status quo.

**6.** Under Article 14 of the extended agreement, a "grievance" is defined as "a complaint regarding an interpretation or application of the terms of this Agreement or any other terms of employment or actions affecting the work situation."

**7.** In addition to *Grandinetti*, there are other cases where the employer enacted or threatened to enact certain changes in violation of the status quo that existed at the time of the expiration of the collective bargaining agreement. *See, e.g., New Castle v. Unemployment Compensation Board of Review*, 159 Pa.Cmwlth. 611, 633 A.2d 1339 (1993) (employer changed the status quo by unilaterally altering class schedules, pay scales and the authority over faculty beverage machines and profits) and *All American Gourmet Co. v. Unemployment Compensation Board of Review*, 143 Pa.Cmwlth. 330, 598 A.2d 1351 (1991) (employer's plan to revise its attendance program constituted a change in the status quo even though employer had the right under the expired agreement to implement rules of conduct).

The Union presented no evidence other than the specific language of Article 24 of the extended agreement to support its argument that the District changed the preparation time of its teachers. Because the in-school suspension teacher was a new position, its creation raised questions as to the application and interpretation of Article 24.[8] Thus, the Board correctly determined that the District did not alter the status quo because the in-school suspension position raised questions of interpretation that had to be grieved under the terms of the old agreement.

As to the basketball coach issue, Article 15 of the extended agreement requires that vacancies for non-teaching positions be posted at least 10 days before the position is filled and that certain factors be considered when filling the positions. The Union presented no evidence to show that the District violated either of these provisions. In fact, the basketball coach position was posted and only Hopkins applied, but the District did not appoint Hopkins to the position. However, the extended agreement did not require the District to automatically appoint the lone applicant simply because he was a member of the union.[9]

Also, the agreement did not prohibit the District from re-posting the position as it did in this case. When the position was re-posted, Hopkins did not apply and the District hired a non-bargaining unit member out of four applicants. If Hopkins had applied when the District re-posted the position, the District would have been required to hire him over the other applicants under Article 18 of the extended agreement. A refusal by the District to hire Hopkins at that point would most likely have been considered a change in the status quo. However, he did not re-apply and the District did not take any action to prevent him from re-applying. The question of whether the extended agreement prohibits the District from re-posting a position where a qualified bargaining unit member is the only person to initially apply for the position involves an issue of interpretation of the provisions in the extended agreement. Hence, the Board correctly found no alteration of the status quo. The bottom line in this case is that all of the alleged alterations of the status quo were grievances governed by the grievance procedures in the extended agreement.

Unlike *Grandinetti* where the employer changed a term of the continuing agreement, the District in the instant case did not institute changes in the terms of the extended agreement. Rather, the alleged alterations by the District presented disputes as to the interpretation of the terms and conditions set forth in the extended agreement, which continued to govern the relationship between the parties. In *Westinghouse Electric Corporation v. Unemployment Compensation Board of Review*, 187 Pa. Superior Ct. 391, 396, 144 A.2d 673, 676 (1958), the Pennsylvania Superior Court stated that "[e]mployes who cease work because of an alleged breach of contract by the employer are not entitled to compensation where the collective bargaining agreement provides a grievance procedure for the settlement of such disputes." Although the work stoppage in *Westinghouse* occurred while the collective bargaining was still in effect, we believe that the same grievance requirements should apply where the parties are working under an extension of the expired collective bargaining agreement.

The purpose of the Unemployment Compensation Law is to provide benefits to persons who are unemployed through no fault of their own. The Law was not intended to promote work stoppages by employees because of contractual disputes with their employer where there are grievance procedures available for the settlement of such disputes. *Westinghouse*. To permit employees to initiate a work stoppage and collect benefits simply because their employer disagrees with their interpretation of the disputed terms of an extended agreement, which continues to govern the employment relationship, would place employers between a rock

8. We note that the term "teacher" is not defined in the extended agreement.

9. The Union filed a grievance on behalf of Hopkins in July 1996, which was later granted by the District on October 8, 1996. As a result, the District appointed Hopkins to the position. However, Hopkins never officially accepted the position.

and a hard place. Under the Union's position in the instant case, the employer must yield to employee demands or pay unemployment compensation benefits. This places employers in an untenable position. The provisions of the extended agreement at issue here did not require the District to simply accept the terms as defined by the Union. Thus, the District's actions in this case did not alter the status quo as it existed at the expiration of the collective bargaining agreement and the work stoppage must be deemed a strike.

Accordingly, the order of the Board denying unemployment compensation benefits is affirmed.

#### ·ORDER

AND NOW, this 9th day of January, 1998, the order of the Unemployment Compensation Board of Review in the above-captioned matter is hereby affirmed.